IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

KIMBERLY MCMURRAY,           )
                             )
            Plaintiff,       )
                             )
     v.                      )   Case No.
                             )   08-5044-CV-SW-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,          )
                             )
            Defendant.       )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kimberly McMurray seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles II
and XVI of the Social Security Act ("the Act").  Plaintiff argues
that the ALJ erred in discredited the opinion of plaintiff's
treating physician, Dr. Malcolm Oliver, and in failing to
properly evaluate plaintiff's credibility.  I find that the
substantial evidence in the record as a whole supports the ALJ's
finding that plaintiff is not disabled.  Therefore, plaintiff's
motion for summary judgment will be denied and the decision of
the Commissioner will be affirmed.

## I.  BACKGROUND

On July 20, 2005, plaintiff applied for disability benefits
alleging that she had been disabled since June 25, 2004.
Plaintiff's disability stems from back and hip pain, major
depression, anxiety, carpel tunnel syndrome, headaches, and

sleeplessness.  Plaintiff's application was denied on October 19,
2005.  On October 16, 2007, a hearing was held before an
Administrative Law Judge.  On November 30, 2007, the ALJ found
that plaintiff was not under a "disability" as defined in the
Act.  On March 25, 2008, the Appeals Council denied plaintiff's
request for review.  Therefore, the decision of the ALJ stands as
the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply

a balancing test to evidence which is contradictory." <u>Wilcutts</u>
<u>v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v.</u>
<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." <u>Richardson v. Perales</u>, 402
U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991).  However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts.  "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
<u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of
proving she is unable to return to past relevant work by reason
of a medically-determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the
plaintiff establishes that she is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that

3

the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo.

2000).

The Social Security Administration has promulgated detailed

regulations setting out a sequential evaluation process to

determine whether a claimant is disabled.  These regulations are

codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step

sequential evaluation process used by the Commissioner is

outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.   Is the claimant performing substantial gainful
activity?

              Yes = not disabled.
              No = go to next step.

    2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits her ability
to do basic work activities?

              No = not disabled.
              Yes = go to next step.

    3.   Does the impairment meet or equal a listed impairment
in Appendix 1?

              Yes = disabled.
              No = go to next step.

    4.   Does the impairment prevent the claimant from doing
past relevant work?

              No = not disabled.
              Yes =  go to next step where burden shifts to Com-
missioner.

4

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Dr. Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

### A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1989 through 2007:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1989 | $  3,773.96 | 1999 | $13,387.64 |
| 1990 | 4,649.11 | 2000 | 5,201.38 |
| 1991 | 882.93 | 2001 | 6,118.88 |
| 1992 | 607.05 | 2002 | 15,419.00 |
| 1993 | 273.27 | 2003 | 10,145.25 |
| 1994 | 686.38 | 2004 | 10,031.91 |
| 1995 | 665.68 | 2005 | 0.00 |
| 1996 | 13,882.40 | 2006 | 0.00 |
| 1997 | 6,447.24 | 2007 | 0.00 |
| 1998 | 11,990.77 | | |

(Tr. at 65).

5

**Functional Report**

In a Functional Report completed on September 17, 2005, plaintiff reported that during a typical day she will get up and feed her granddaughter, clean her house, watch television, feed her granddaughter lunch, "find any-thing [sic] to do with her," watch television again, cook dinner, bathe her granddaughter, watch television, then go to bed (Tr. at 112). She reported that she took care of her granddaughter: "I have to do every-thing [sic] for her." (Tr. at 113). She reported that she was able to prepare complete dinners and sandwiches, that she cooks daily, and that it usually takes her about two hours to prepare a meal (Tr. at 114). She reported being able to clean for three hours per day and do laundry twice a week (Tr. at 114). She reported being able to shop once a week for no longer than an hour (Tr. at 115).

Plaintiff was asked to circle all items her condition affects (Tr. at 117). She circled lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and using her hands (Tr. at 117). She did NOT circle memory, completing tasks, concentration, understanding, following instructions, or getting along with others (Tr. at 117). She is able to pay attention "for a long time" if it is "interesting" (Tr. at 117).

6

**Notice of Commencement/Termination of Compensation**

The Missouri Department of Labor and Industrial Relations, Division of Workers' Compensation, notified plaintiff that her worker's compensation income which had begun on June 1, 2004, was ending as of June 22, 2004 (Tr. at 55). Plaintiff was paid $1,507.38 for the 22 days of disability.

**B.    *SUMMARY OF MEDICAL RECORDS***

On Saturday, May 29, 2004, plaintiff went to the emergency room at Cox Health (Tr. at 234-237, 315-320). She reported having twisted her back at work the previous evening. She was assessed with acute myofascial strain. She was given a prescription for Vicodin (narcotic) and told to stay off work until June 1, 2004.[1]

On June 1, 2004, plaintiff saw Thomas Corsolini, M.D. (Tr. at 392-394, 409, 413). On the initial paperwork, plaintiff reported that her current weight was 132 but had been 115 a year earlier. She reported a history of migraine headaches and arthritis in her hands, but no other conditions. She reported having smoked 1/2 pack of cigarettes per day for the past 20 years. Plaintiff reported her pain as a seven out of ten, and said it was the same when the pain started.

---

[1]June 1, 2004, was a Tuesday following the May 31, 2004, Memorial Day holiday, i.e., three days after plaintiff's ER visit.

7

The record reads in part as follows:

PHYSICAL EXAMINATION:  . . .  She walks smoothly without limp or hesitation.  Muscle stretch reflexes normal bilaterally at biceps, triceps, and brachioradialis locations.  Muscle stretch reflexes normal bilaterally at patellar and Achilles locations.  She is able to bend backwards 10 degrees at the waist, bend forward 60 degrees at the waist, with evidence of mild discomfort in each direction.  She also has pain when doing a squat or when rotating her torso.  Palpation and percussion find discomfort along the left thoracic paraspinal muscle groups at about the T8 level.  She also is mildly uncomfortable at the left lumbar paraspinal group.

DISCUSSION:  Generalized back strain.  I gave a prescription for physical therapy for the Heartland Clinic in Springfield. This will be over the upcoming week and I would like to see her again in one week and I will keep her off work until then.

On June 2, 2004, plaintiff was evaluated by a physical therapist at Heartland Physical Therapy (Tr. at 324-325, 335, 337).  Goals and treatment were discussed.

On June 3, 2004, plaintiff attended her first session of physical therapy (Tr. at 326, 339).  "States she is very sore. 'No one is touching me today.'"  Therapist Stan Brown performed very gentle stretches and massage.  Plaintiff complained of hip pain after treatment.

On June 4, 2004, plaintiff had physical therapy with Stan Brown (Tr. at 327, 340).  After "gentle" massage, plaintiff remained very sensitive.

On Monday, June 7, 2004, plaintiff returned to physical therapy (Tr. at 328, 330, 336, 338, 341, 354).  She reported that

8

her pain was now a 5/10, down from 9-10/10.  She reported increased pain with lifting her grandchild and driving for extended periods of time, i.e., "one hour or more."

On June 8, 2004, plaintiff saw Dr. Corsolini (Tr. at 391, 415).  "Ms. McMurray has attended some physical therapy appointments and feels a little bit better than she did last week.  She is able to demonstrate normal range of motion all directions in the cervical, thoracic, and lumbar spine.  She does have some discomfort in the thoracic spine with back bending. Palpation continues to find some discomfort along the left mid thoracic muscle group.  Mild to moderate improvement in symptoms over the first week.  Ms. McMurray does not appear to be ready to return to her regular work just yet.  I will recommend continuing therapy, two additional appointments this week and return to unrestricted work on the 14th. Followup should not be necessary."

On June 9, 2004, plaintiff returned for physical therapy (Tr. at 329, 342).  She reported decreased pain overall but increased pain with lifting.  She endured her treatment well. Plaintiff reported she was scheduled to return to work on June 15 (in six days).

On June 11, 2004, plaintiff saw Thomas Corsolini, M.D., with complaints of back pain (Tr. at 361, 390, 411, 417).  "She still indicates the area between the left scapula and her spine and

9

somewhat lower as the area that's bothering her the most. She's not complaining much of low back pain. She says some of therapy treatment has been painful, and some has been helpful. She hasn't been able to tolerate electrical stimulation. She is able to make normal range of motion all directions in the cervical spine, thoracic spine, and lumbar spine. Palpation finds continued discomfort in the left thoracic paraspinal group at about the T8 level. No significant tenderness in the lower back. I'm going to recommend three additional therapy appointments next week, and keep her off work one additional week, planning to return to regular work on the 21st. Follow up only if this was not successful."

On Monday, June 14, 2004, plaintiff returned for physical therapy (Tr. at 331, 343, 353). Plaintiff was unable to relax during her massage.

On June 15, 2004, plaintiff had physical therapy (Tr. at 332, 344, 352). The notes state, "feels better -- took meds today." She was observed to be more relaxed.

On June 16, 2004, plaintiff had her last physical therapy session (Tr. at 333, 345, 351). Plaintiff said she "keeps busy all the time - hates to sit around." She rated her pain an 8/10. She was assessed with minimal to no progress made.

10

On June 20, 2004, physical therapist Stan Brown wrote a discharge summary (Tr. at 334, 346, 350). "Patient was seen for a total of seven visits for complaints of acute and severe low back, hip and groin pain. Patient stated on her last visit that she 'keeps busy all the time because she hates to sit around.' Patient also stated that her pain was approximately an 8/10 on a 1-10 pain scale. Patient had stated three visits earlier that her pain was approximately 5/10. . . . Patient made some progress, and her sensitivity had decreased somewhat, but she continued to be very hypersensitive with her treatments. No further orders were received, and patient had expressed three visits ago that she had received about 50% improvement, but on her last visit, expressed that she really had made no improvement. Therefore, patient will be discharged this date."

On June 21, 2004, plaintiff was released to return to work full time without restrictions (Tr. at 360, 396, 406, 412, 418).

On June 23, 2004, plaintiff saw Thomas B. Corsolini, M.D. (Tr. at 359, 389, 419, 420). Plaintiff complained that she was still having pain in her middle back that had kept her from returning to work. "She does not complain of any radiation of pain to her legs or her arms. She is able to demonstrate normal lumbar and thoracic range of motion with an indication of discomfort with full forward bending and full back bending.

11

Palpation finds an area along the lower left thoracic paraspinal group that seems to be mildly uncomfortable to direct touch. My impression is that this is not a significantly impairing type of discomfort. I gave Biofreeze analgesic gel for home use, and reviewed stretches that Ms. McMurray can do on her own. I also reviewed over-the-counter medications. I think she should be able to return to unrestricted work tomorrow, and I am not planning on seeing her again in followup."

On June 24, 2004, plaintiff was released to return to work full time with no restrictions by Dr. Corsolini (Tr. at 358, 395, 405, 421). Her diagnosis was "back strain" and treatment was "over the counter medicine."

June 25, 2004, is plaintiff's alleged onset of disability.

Thomas Corsolini, M.D., rendered his opinion (on May 9, 2005, after having reviewed plaintiff's August 25, 2004, MRI of her mid and lower back, referenced below) that plaintiff reached maximum medical improvement on August 1, 2004 (Tr. at 363, 423). He found that she sustained a mid and lower back strain on June 1, 2004. "I would not place any limitations on her ability to work, and I do not think that any further medical treatment is indicated."

On August 11, 2004, plaintiff saw Dr. Oliver complaining of back pain since May 28, 2004 (Tr. at 377-378, 485-486, 536-537,

12

620-621).  Plaintiff reported that her pain was "nearly unbearable at times, can't pick up 2 year old grandchild."  She reported that Skelaxin (a muscle relaxer) had not been much help; Motrin (non-steroidal anti-inflammatory) had helped some.  She also reported daily headaches.  The physical exam section of the form is blank except a notation of muscle spasms and decreased flexion.  Dr. Oliver assessed low back pain.  He told her to increase her Motrin to 800 mg. per day and do stretching exercises.  He told her to return as needed.  The appointment, which lasted 20 minutes, included counseling regarding her diagnosis, compliance with medication, and exercise.

On August 25, 2004, plaintiff had an MRI of her lumbar spine (Tr. at 357, 379-380, 428, 483-484, 540-541, 624-625).  The impression was "largely unremarkable exam."  Plaintiff had mild degenerative disc disease of the facets at L4-5.

On September 15, 2004, plaintiff saw Dr. Oliver for a consult on her MRI (Tr. at 374-376, 481-482, 534-535, 618-619).  The physical exam section of the form was left blank with the exception of a notation that she was oriented times three with normal mood and affect.  He assessed chronic low back pain.  He gave her a prescription for Ultram[2], told her to continue stretching exercises, and referred plaintiff to a pain

---

[2]Ultram is a narcotic-like medication used to treat moderate to severe pain.

13

specialist.  The visit was dominated by counseling and lasted 15 minutes.  That same day, Dr. Oliver wrote, on a St. John's Clinic - Republic prescription pad, a prescription limiting plaintiff's lifting to no more than ten pounds[3] (Tr. at 385).

On October 18, 2004, plaintiff completed an orthopedic history at St. John's Orthopedic Clinic (Tr. at 552-553).  She reported her current medications as Ibuprofen (non-steroidal anti-inflammatory) and Ultram (narcotic-like pain reliever).  She reported that she was rarely exercising but she continued to smoke 1/2 pack of cigarettes per day.  She listed her occupation as "CNA".  Under review of symptoms, plaintiff checked headaches, arthritis, and joint pains.  There is no indication of any exam, and the diagnosis is listed as "PO2 97%".  The form was reviewed by Robert Wyrsch, M.D.

On November 15, 2004, plaintiff saw Dr. Oliver for back pain that she reported was aggravated by lying down, sitting, or standing (Tr. at 371-372, 479-480, 532-533, 616-617).  She said that she had gotten a little better during physical therapy, but then she got worse after they did electrical stimulation.  On exam, plaintiff had muscle spasm in her back and decreased range

---

[3]Also in the record is a message on a printed St. John's Clinic - Republic message pad.  It is undated.  It lists plaintiff's name and phone number and says, "Wants note for work until she can get into pain specialists.  Unable lift over 10 lbs."  In another handwriting, there appears the following:  "OK" with illegible initials.

14

of motion (no range of motion numbers were listed).  Dr. Oliver assessed acute myofascial lumbar strain and low back pain.  Under treatment plan, he recommended stretching exercises.  Under "discharge medications", he checked "see medication log" and wrote Flexeril (muscle relaxer), Motrin (non-steroidal anti-inflammatory) 800 mg., Lorcet (narcotic).  He told her to follow up as needed.  The appointment lasted 15 minutes.

On December 15, 2004, plaintiff saw Dr. Oliver for a following up on back pain (Tr. at 369-370, 476, 478, 530-531, 614-615).  He noted that her pain had improved with good compliance with therapy.  The physical exam section of the form noted that plaintiff was alert and in no acute distress, her neck was normal and non-tender, she had no vascular compromise, she had vertebral tenderness in her back with decreased range of motion (45° flexion, 20° extension, 15° RLF, and 15° LLF), straight leg raising was negative, she was oriented times three with normal mood and affect, she was in no respiratory distress, and she had a regular heart rate and rhythm.  Plaintiff reported that her pain was moderate and interfered with performing household chores in that she was only able to work for 30 minutes before needing a break.  He assessed low back pain.  Dr. Oliver recommending stretching exercises, Motrin up to three times a

15

day, and Tylenol for headaches.  He told her to return as needed.
The visit lasted 15 minutes.

On May 4, 2005, plaintiff completed a Patient Intake
Questionnaire at St. John's Clinic, Occupational Medicine (Tr. at
364-365, 424-427).  She reported that she had been exercising
regularly and that she had smoked 1/2 pack of cigarettes per day
for the past 20 years.  She saw Dr. Corsolini who noted that he
had treated plaintiff with physical therapy after a May 2004
injury to her back.  "We did recommend return to regular work,
most likely near the end of June, and she says she worked one
shift and was terminated by that employer. . . .  She says she
has chronic low back pain and is now scheduled to see the pain
clinic later this month.  She said it is so bad that some
mornings her husband has to help lift her out of bed.
Nonetheless, she still drives a car and does some limited
housework. She has a 3-year-old grandchild in the home with her,
but says she cannot lift this child anymore.  She says her pain
is in her low back without radiation to her legs, walking and
sitting generally are not particularly painful, just
uncomfortable.  She takes 10 mg hydrocodone [narcotic] four times
daily and 800 mg ibuprofen [non-steroidal anti-inflammatory]
about twice daily.  She also takes 10 mg Flexeril [muscle
relaxer] at night."  Plaintiff's physical exam revealed normal

16

muscle strength, normal and pain-free range of motion in her
hips, the ability to walk smoothly without evidence of limp or
hesitation, and the ability to squat independently.  Straight-leg
raising showed some evidence of low back pain but no leg pain.
Plaintiff could bend backwards 20° at the waist and forward 60°.
Palpation in the lower back was a little uncomfortable, lumbar
rotation test was negative, lumbar compression test resulted in
plaintiff's report of low back pain.  "At this time, the
examination does not seem to be consistent with the degree of
discomfort and functional impairment reported by Ms. McMurray.  I
need to obtain her records including her MRI from last year.  She
may followup by telephone after that is available."

On May 18, 2005, plaintiff was seen by Benjamin Lampert,
M.D., at St. John's Pain Management Center (Tr. at 439-440, 453-
454).  "The patient has been having central lower back pain since
injuring herself at work.  This was originally a Workmen's
Compensation claim which was denied and she is in litigation
about it."  Plaintiff reported that her pain was in her central
lower back 85% of the time and 15% of the time it radiated into
her upper thighs.  "Her pain is so severe in the morning that her
husband has to help her get out of bed.  She has a long history
of smoking cigarettes.  She has had a significant amount of
anxiety and stress lately as well in that she has to manage a

17

three year old granddaughter who she is raising.  Her lower back

pain is worse when she bends over and ranges between 5-10/10 in

severity.  She has been taking some hydrocodone [narcotic],

nonsteroidal antiinflammatory medications, and Flexeril [muscle

relaxer]."  Plaintiff's gait was normal.  She had some tenderness

to light touch and positive Waddell's signs.[4]  She had some pain

behaviors and appeared to be somewhat depressed.  She had full

range of motion in her back with pain.  Straight leg raising was

negative.  Plaintiff had good range of motion in the hips, knees,

and ankles.  Plaintiff's neurological exam was normal, her mood

and affect were appropriate, she was alert and oriented times

three.  Her short-term memory and higher cognitive functioning

were intact.  Dr. Lampert reviewed plaintiff's lumbar MRI films.

---

[4]Waddell's signs are a group of physical signs, first
described by Waddell et al in 1984, in patients with low back
pain. They are thought to be indicators of a non-organic or
psychological component to pain. Historically they have been used
to detect "malingering" patients with back pain. Waddell's signs
are:  Superficial tenderness - skin discomfort on light
palpation; Nonanatomic tenderness - tenderness crossing multiple
anatomic boundaries; Axial loading - eliciting pain when pressing
down on the top of the patient's head; Pain on simulated rotation
- rotating the shoulders and pelvis together should not be
painful as it does not stretch the structures of the back;
Distracted straight leg raise - if a patient complains of pain on
straight leg raise, but if the examiner extends the knee with the
patient seated (e.g., when checking the Babinski reflex);
Regional sensory change - Stocking sensory loss, or sensory loss
in an entire extremity or side of the body; Regional weakness -
Weakness that can be overpowered smoothly (organic weakness will
be jerky, with intermittent resistance); Overreaction -
Exaggerated painful response to a stimulus that is not reproduced
when the same stimulus is given later.

Case 3:08-cv-05044-REL   Document 23   Filed 09/20/09   Page 18 of 67

"All of her discs appear to be pristine.  She had some mild

spondylosis at L4-5 bilaterally but no signs of neural

impingement. . . .  There may be a very slight loss of disc

signal in the L4-5 disc but this would be somewhat of a stretch

to call."  Dr. Lampert assessed chronic back pain, smoking

history, major depression, and "some psychological overlay

related to secondary gain with her husband and possible primary

gain with litigation."  He suggested that plaintiff either try to

get through her lawsuit or drop it and "concentrate on

functioning".  He recommended she not take the hydrocodone

(narcotic) but some antidepressants.  He gave her a prescription

for Cymbalta and explained that it is fairly good at relieving

pain.  "I think more effective stress and depression management

might help significantly with her back pain."

On July 28, 2005,[5] plaintiff was seen by Mary Bolser-DeClue,

R.N., at St. John's Pain Management Center (Tr. at 441-447, 451-

452).  Plaintiff was asked to check the type of pain she was

suffering - she checked right and left leg pain and back pain but

did not check head pain.  Plaintiff reported some confusion with

her Cymbalta, having started at 30 mg., increased to 60 mg., and

decreased again to 30 mg.  Ms. Bolser-DeClue provided a new

_____

[5]The first page of the record is dated July 28, 200**4**;
however, the body of the record refers to a visit to Dr. Lampert
in May 2005, and the second page of the record is dated July 28,
200**5**.

19

prescription for 60 mg. of Cymbalta.  Plaintiff reported problems with sleeping.  "Of her back, she reports that she feels like she gets a very sharp sting that hits her in the middle of the back and goes down the left leg.  She experiences numbness in her lower buttock and her left leg she feels like dead weight."  On exam plaintiff was observed to be alert and oriented times three in no acute distress, attention and concentration were focused, mood and affect were appropriate.  Her gait was normal, she could stand on heels and toes, she could flex forward to about 60 degrees and extend to 10 to 15 degrees.  She was limited by pain with extension.  She had some tenderness in the low back region on palpation.  She had no tenderness over the sacroiliac joints.  Straight leg raising was negative.  "[W]ith any test that I do, her face expresses pain before the actual test is completed, and actually getting through the examination, she finds that she has not the pain that she anticipated having."  Ms. Bolser-DeClue assessed chronic back pain, history of smoking, and "symptom amplification with positive axial loading[6] and rotation and overreaction of facial expressions."  She recommended Celebrex for inflammation, Amitriptyline for sleep, and told plaintiff to do exercises twice a day.

---

[6]Axial loading (pressing down on the top of the head) is one of the Waddell's signs used to detect malingering or a psychological explanation for back pain without a physical cause.

20

On August 23, 2005, plaintiff was seen at the emergency department of St. John's (Tr. at 465-470). She reported back pain which had gotten worse over the past two days. She reported her pain a ten out of ten, said it was exacerbated by movement and relieved by nothing. The form indicates plaintiff was smoking one pack of cigarettes per day. Plaintiff had pain with range of motion in her back. Straight leg raising was negative on the right, positive at 30° on the left. She was given prescriptions for Percocet (narcotic) and Flexeril (muscle relaxer).

On August 29, 2005, plaintiff was seen by Mary Bolser-DeClue, R.N., at St. John's Pain Management Center (Tr. at 433-436, 449-450,455-456, 459-460). Plaintiff reported back pain that affects both of her hips. She said she was unable to shave her legs because flexing forward caused her to have low back spasms. Plaintiff was currently taking ibuprofen (non-steroidal anti-inflammatory), Amitriptyline (antidepressant), Celebrex (non-steroidal anti-inflammatory), and Cymbalta (antidepressant). She reported that none of those medications made any difference in her pain level. Plaintiff said she went to the emergency room a week prior and was given Percocet (narcotic) and Flexeril (muscle relaxer) but those did not help her pain either. Plaintiff continued to smoke a half a pack of cigarettes per day.

21

"She has sleep disturbance with her pain, and she reports that
she feels like she has been beaten with a ball bat.  She also
reports that she feels like she is just constantly irritable."
On exam plaintiff was observed to be alert and oriented times
three, she was in no acute distress, her attention and
concentration were focused, her mood and affect were appropriate.
Plaintiff had a normal gait and was able to stand on her toes and
heels.  Her back was tender on the lower lumbar spine and on the
sacroiliac joints bilaterally.  Straight leg raising was "very
limited to less than 20° bilaterally".  Reflexes were diminished
but muscle strength was 5/5.  Ms. Bolser-DeClue assessed lumbar
pain, depression, and anxiety.  She recommended Effexor
(antidepressant) for hot flashes.  "I am going to refer her back
to her primary care physician to evaluate her hormones to see if
she is premenopausal and if there is something that can be given
to her to relieve her of her irritability and mood swings."

     On September 20, 2005, plaintiff saw Dr. Oliver for a follow
up of back pain (Tr. at 367-368, 474-475, 528-529, 612-613).
Plaintiff also reported mood swings and hot flashes.  Dr. Oliver
noted that plaintiff's pain had improved with good compliance
with therapy.  The physical exam section of the form was blank
except for a notation that plaintiff was alert and in no acute
distress, she was oriented times three with normal mood and

affect, she was in no respiratory distress, and she had a regular heart rate and rhythm. He assessed chronic pain; and where the form asks for the site, he wrote: "? perimenopausal". The visit was "dominated by counseling" and he spent 15 minutes with plaintiff. The treatment plan section of the form was blank.

On October 12, 2005, Kenneth Burstin, Ph.D., completed a Psychiatric Review Technique (Tr. at 165-178). He found that plaintiff's mental impairment is not severe. He found that her depression resulted in no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In support, he wrote the following:

> 49-year-old claimant who alleges disability due to depression and musculoskeletal restrictions. The cl[aimant] reports being prescribed celebrex, cymbalta and effexor, which she may or may not be taking as prescribed. No MER [medical records] from reported prescribing source, and MDI [medically diagnosed impairment] is by inference only from reported RX [prescription].
>
> The MER does not indicate that the claimant has c/o [complained of] depression at her visits for tx. [treatment], she has no admissions for any psych-related impairment and has never been referred to a MH [mental health] professional. 9/05 MER from Dr. Oliver noted normal mood and affect.
>
> Her ADLs [activities of daily living] indicate that she cares for one child and one grandchild. She suggests that she doesn't like to talk to others, and that she doesn't like change, but otherwise does not allege psych-related

23

limitations, and there is no support for allegations in the
MER.

Technically, no MDI [medically diagnosed impairment];
however, inferring MDI from Rx [prescriptions], there is no
clear evidence of severe, much less disabling, limitations.

On October 27, 2005, plaintiff completed an orthopedic

history at St. John's Orthopedic Clinic (Tr. at 550-551). She

reported that her current medications were Ibuprofen (non-

steroidal anti-inflammatory) and Effexor (antidepressant). She

reported doing monthly stretching exercises and continuing to

smoke 1/2 pack of cigarettes per day. Under occupation,

plaintiff wrote "CNA 15 yrs". Under review of symptoms, plaintiff

checked headaches, migraines, joint pains and night pain. The

diagnosis section of the form is blank, and there is no

indication that anything was done other than recording

plaintiff's height, weight, blood pressure, and pulse. The form

indicates it was reviewed by Dr. Wyrsch.

On November 8, 2005, plaintiff saw Dr. Wyrsch (Tr. at 491-

497). Plaintiff reported tingling and numbness in her hands. At

the time she was taking ibuprofen (non-steroidal anti-

inflammatory) and Effexor (antidepressant). Plaintiff was

observed to be "healthy appearing" and alert and oriented. On

exam, plaintiff had positive Phalen's[7] and Tinel's[8] tests

_____

[7]The patient rests his elbows on a flat surface such as a
desk, with the elbows bent and the forearms up. The patient then

24

bilaterally.  She was assessed with continued symptoms of carpel tunnel syndrome in both hands. She underwent carpel tunnel release on her left hand as an outpatient procedure.

On November 30, 2005, plaintiff had an ultrasound of her abdomen after complaining of right upper quadrant pain (Tr. at 511).  The results were normal.

On December 11, 2005, plaintiff was seen in the emergency department of Cox Health (Tr. at 502-508).  She complained of cough, shortness of breath, and chest tightness.  "Tried smoking, but couldn't."  She listed Ibuprofen (non-steroidal anti-inflammatory), Effexor (antidepressant), Flexeril (muscle relaxer), and Hydrocodone (narcotic) as her current medications. She was assessed with bronchitis.

On January 19, 2006, plaintiff saw Dr. Oliver and complained of back pain (Tr. at 526-527, 609-610).  No physical exam was performed.  Dr. Oliver assessed chronic back pain and prescribed Percocet (narcotic).  The appointment lasted ten minutes.

On February 28, 2006, plaintiff saw Dr. Oliver and complained of back pain (Tr. at 524-525, 607-608).  No physical

flexes his wrists, letting his hands hang down for about 60 seconds. If the patient feels tingling, numbness, or pain in the fingers within 60 seconds, he may have carpal tunnel syndrome.

[8]Examiner taps on the inside of the wrist over the median nerve. If the patient feels tingling, numbness, "pins and needles," or a mild "electrical shock" sensation in the hand when tapped on the wrist, the patient may have carpal tunnel syndrome.

25

exam was performed.  Dr. Oliver prescribed Percocet (narcotic) and recommended chiropractic adjustment.  The appointment lasted ten minutes.

On March 30, 2006, plaintiff saw Dr. Oliver and complained of back pain and coughing (Tr. at 522-523, 605-606).  She reported coughing "all the time" and said her symptoms were interfering with her sleep.  She was listed as a smoker, with the notation "trying to quit."  She was diagnosed with pneumonia and restless legs.  Dr. Oliver prescribed Levaquin (antibiotic), Percocet (narcotic), and Requip (treats restless leg syndrome). The appointment lasted 15 minutes.

On May 9, 2006, plaintiff returned to see Dr. Oliver and complained of chest pain, hip pain, and back pain "worse recently from coughing" (Tr. at 520-521, 602-603).  The coughing was worsened by nothing, relieved by lying down.  She was diagnosed with a virus and told to use non-steroidal anti-inflammatories. Her Effexor (antidepressant) was refilled.  She was told to return as needed.  The appointment lasted ten minutes.

On June 1, 2006, plaintiff saw Dr. Oliver and complained of trouble sleeping (Tr. a 518-519, 600-601).  The only medication listed was Ibuprofen (non-steroidal anti-inflammatory).  The physical exam section of the form is blank except for no respiratory distress, normal breath sounds, and normal heart

26

rate, rhythm, and sounds. He assessed chronic pain in the back and hips and ringing in the ears. Discharge medication was Percocet (narcotic). He told her to come back in three to four months. The appointment lasted 15 minutes.

On June 13, 2006, plaintiff had an MRI of her head due to ringing in the ears and hearing loss (Tr. at 538-539, 622-623). The MRI was normal.

On August 16, 2006, plaintiff saw Dr. Oliver for a "suspicious mole" on her leg (Tr. at 516-517, 598-599). No treatment plan is listed, no exam was performed. The appointment lasted 15 minutes.

On October 12, 2006, plaintiff had x-rays of her hands after complaints of pain and swelling (Tr. at 548-549). Her medications were listed as Ibuprofen (non-steroidal anti-inflammatory), Flexeril (muscle relaxer), Mobic (non-steroidal anti-inflammatory), Effexor (antidepressant), and Requip (treats restless leg syndrome). She reported rarely exercising and that she was smoking 1/2 pack of cigarettes per day. Under review of symptoms, plaintiff checked depression, headaches, migraines, and joint pains.

On January 31, 2007, plaintiff was examined by Shane L. Bennoch, M.D., of Missouri Independent Medical Evaluations, LLC (Tr. at 558-584). Dr. Bennoch outlined plaintiff's report of the

27

history of her hand pain and problems and her back pain beginning
with her on-the-job injury on May 28, 2004.  He then reviewed
medical records of plaintiff's treating physicians since 1998.
Portions of Dr. Bennoch's report are as follows:

PHYSICAL EXAMINATION:

Mental Status:  At the present by observation, she does not appear to
have depressed affect. Thought content appears to be appropriate as
does speech and behavior.

* * * * *

Balance/Gait:  She can heel-to-shin and heel to toe walk without any
difficulty.  She does not have a limp.

Straight leg raising:  While lying she is positive for straight leg raising
bilaterally at about 50 degrees and describes the pain going into her hips.
While sitting, she is negative bilaterally for straight leg raising.

MUSCULOSKELETAL EXAM:

Spine:

Lumbar ROM:

|  | NORMAL | PATIENT |
|---|---|---|
| FLEXION | 60 | 50 |
| EXTENSION | 25 | 20 |
| L LAT FLEXION | 25 | 10 |
| R LAT FLEXION | 25 | 8 |

Palpation:  . . .  She is tender along the lumbar spine and both
sacroiliac joints.  She also has some tenderness along the paraspinal
muscles although it is not reproducible.

28

Comments: The patient with axial loading[9] does complain of pain in her low back area. She does not appear to react inappropriately however to touching of the skin as far as describing pain.

\* \* \* \* \*

WRISTS & HANDS:

ROM: She appears to flex, extend, radial and ulnar deviate normally.

Entrapment: Tinel's and Phalen's are positive bilaterally. Finkelstein's[10] positive on the right thumb and negative on the left.

Opposition: The patient can thumb-to-fifth finger oppose.

Atrophy: No muscle atrophy.

\* \* \* \* \*

MUSCLE STRENGTH:

|  | QUADS | HAMSTRINGS | DORSIFLEXION | PLANTAR FLEXION |
|---|---|---|---|---|
| Right | 4/5 | 4/5 | 5/5 | 5/5 |
| Left | 4/5 | 4/5 | 5/5 | 5/5 |

HIPS: While lying flat she appears to have normal hip range of motion with normal internal rotation and external rotation without complaints of pain in her back or hips. Patricks testing[11] is positive left not right.

---

[9]Axial loading (pressing down on the top of the head) is one of the Waddell's signs used to detect malingering or a psychological explanation for back pain without a physical cause.

[10]Examiner passively flexes thumb across the palm. Thumb pain suggests De Quervain's Tenosynovitis - inflammation of the thumb extensor tendons.

[11]Thigh and knee of the supine patient are flexed, the external malleolus rests on the patella on the opposite leg, and

29

* * * * *

OPINIONS AND DIAGNOSIS:

THE OPINIONS AND DIAGNOSIS ARE BASED ON THE MEDICAL RECORDS PROVIDED TO ME (THESE ARE AVAILABLE AT OUR OFFICE FOR INSPECTION) AND THE HISTORY AND PHYSICAL WERE PERSONALLY COMPLETED BY ME. THEY ARE BASED ON A REASONABLE DEGREE OF MEDICAL CERTAINTY.

DIAGNOSES OF PRESENT INJURY:

1. Carpal tunnel syndrome of the right hand.

2. Carpal tunnel release of the right hand.

3. Reoccurrence of carpal tunnel syndrome in the right hand.

4. De Quervain's tenosynovitis on the right hand.

5. Dorsal compartment release surgery of the right thumb.

6. Reoccurrence of first dorsal compartment syndrome of the right thumb.

7. Fall and twisting injury of the lower back with musculoligamentous strain with tearing and likely scarring with persistent pain.

8. Twisting injury to the sacroiliac joints bilaterally mostly with ligamentous injury and persistent pain.

DIAGNOSES OF PREEXISTING INJURIES/DISEASES:

1. Depression.

2. Migraine headaches.

---

the knee is depressed; production of pain indicates arthritis of the hip. Also known as Fabere sign, from the first letters of movements that elicit it (**F**lexion, **AB**duction, **E**xternal **R**otation, **E**xtension).

Case 3:08-cv-05044-REL   Document 23   Filed 09/20/09   Page 30 of 67

CONCLUSIONS:

1.  MMI:
    In my opinion, the patient has reached maximum medical improvement to both her right and left hands and to her right thumb.

    The patient has also reached maximum medical improvement to her lower back.

2.  CAUSATION:
    It is my opinion that the events related to her work at Missouri Rehabilitation was [sic] the prevailing factor in causing the injuries to both hands, both wrists and to her right thumb resulting in impairments.  It is also my opinion that the accident that occurred on May 28, 2004 was the prevailing factor in injuring her lower back resulting in persistent impairment.

3.  IMPAIRMENT RATINGS:
    A.  PRESENT:  Pertaining to and as a direct result of the events leading up to 2002 and beyond while employed by InteliStaf Health Care, it is my opinion that the following industrial impairment exists that is a hindrance to employment or re-employment:

        1.  There is a 30% permanent and partial impairment to the right upper extremity rated at the right wrist and hand due to carpal tunnel syndrome.  Rating takes into account the fact that the patient had surgery for carpal tunnel release and also takes into account that she had failed surgery with return of carpal tunnel symptoms and persistent complaints today.

        2.  There is a 25% permanent and partial impairment to the left upper extremity rated at the left wrist and hand due to carpal tunnel syndrome.  Rating takes into account the fact that the patient required surgery and did have relief of her symptoms although she has some mild symptoms remaining today.

31

3.	There is a 20% permanent and partial impairment to the right upper extremity rated at the right thumb due to de Quervains tenosynovitis.  The rating takes into account the fact that the patient had a first dorsal compartment release with return of her symptoms following the surgery and continued pain today.

Pertaining to and as a direct result of the accident occurred on May 28, 2004 while employed by InteliStaf Health Care, it is my opinion that the following industrial impairment exists that is a hindrance to employment or re-employment:

1.	There is a 15% permanent and partial impairment to the body as a whole rated at the lumbar spine and sacroiliac joints due to musculoligamentous strain of the lumbar spine and ligamentous injury of the sacroiliac joints.  The rating takes into account the fact that based on the persistent pain especially with overactivity that the patient has sustained tearing of both muscles and ligaments in the lumbar spine area and ligaments in the sacroiliac joint areas resulting in sacroiliac joint dysfunction and flare-up of pain with overactivity.

B.	PRE-EXISTING:  There are impairments that exist that are a hindrance to employment or re-employment.

1.	There is a 15% permanent and partial impairment to the body as a whole rated at the brain due to chronic depression diagnosed as a teenager resulting in the patient being on medication since that time for depression.

2.	There is a 5% permanent and partial impairment to the body as a whole rated at the brain due to migraine headaches.  This rating takes into account the fact that the migraine headaches have existed since age 22 and the patient requires medication for control.

32

THE COMBINATION OF HER IMPAIRMENTS DOES CREATE A SUBSTANTIALLY GREATER IMPAIRMENT THAN THE TOTAL OF EACH SEPARATE INJURY/ILLNESS, AND A LOADING FACTOR SHOULD BE ADDED.

ANALYSIS:

The patient did strike me as having some symptom magnification and also did have some positive Waddell's signs,[12] however this may be more related to her underlying psychopathology relating to her depression than specifically related to her physical injuries. . . .

In my opinion neither her symptom magnification nor some question of neurological findings really affects the specific impairments.

The patient also had a positive response to axial loading something that one would not expect with any kind of back pain. However again, it is fairly self evident based on the examination of several physicians including myself that the patient in fact does have pathology to the lower back and sacroiliac joints from her fall in June [sic] of 2004.

---

[12]Waddell's signs are a group of physical signs in patients with low back pain. They are thought to be indicators of a non-organic or psychological component to pain. Historically they have been used to detect "malingering" patients with back pain. Waddell's signs are: Superficial tenderness - skin discomfort on light palpation; Nonanatomic tenderness - tenderness crossing multiple anatomic boundaries; Axial loading - eliciting pain when pressing down on the top of the patient's head; Pain on simulated rotation - rotating the shoulders and pelvis together should not be painful as it does not stretch the structures of the back; Distracted straight leg raise - if a patient complains of pain on straight leg raise, but if the examiner extends the knee with the patient seated (e.g., when checking the Babinski reflex); Regional sensory change - Stocking sensory loss, or sensory loss in an entire extremity or side of the body; Regional weakness - Weakness that can be overpowered smoothly (organic weakness will be jerky, with intermittent resistance); Overreaction - Exaggerated painful response to a stimulus that is not reproduced when the same stimulus is given later.

I do not think there is any evidence of disc disease or nerve impingement. All of her injuries appear to be related to muscles and ligaments both in the lumbar sine and the sacroiliac joints.

Again based on her symptoms, it is likely she has had tearing of ligaments and muscle resulting in scarring which would be the most likely explanation for the persistent pain, especially with overactivity.

I would not recommend any further evaluation or treatment for her carpal tunnel symptoms.

The patient does continue to be fairly symptomatic with her back and I would recommend ongoing treatment with anti-inflammatories and muscle relaxers, medications she is already on and judicious use of hydrocodone.

At present, I think she may be using hydrocodone too frequently at four times a day.

I would recommend she have ongoing pain management to monitor her oral medications.

On February 8, 2007, Dr. Bennoch completed a Medical Source Statement Physical (Tr. at 585-588). He found that plaintiff could occasionally lift 20 pounds and frequently lift less than ten pounds; stand or walk about six hours per day; sit without limitation but must periodically alternate sitting and standing; is limited in her ability to push or pull with her upper and lower extremities (although Dr. Bennoch did not, as the form asked, describe the nature and degree of the limitation); should never climb ramps, poles, ladders, ropes, or scaffolds; should never balance on narrow, slippery or moving surfaces; may occasionally climb stairs, crouch, crawl, or stoop; may not

34

perform any of these postural activities repetitively; may reach without limitation; may only occasionally handle, finger, or feel; and has no environmental, visual, or communicative limitations.

On April 29, 2007, Dr. Oliver prepared a Medical Source Statement Physical (Tr. at 590-594). He found that plaintiff could lift ten pounds frequently or occasionally; stand or walk for a total of five hours per day and for 30 minutes at a time; sit for a total of six hours per day and for a maximum of one hour at a time; had an unlimited ability to push or pull with her upper or lower extremities; should never stoop or crouch; could occasionally climb, balance, kneel, or crawl; had an unlimited ability to reach, handle, finger, or feel; and had no environmental, visual or communicative limitations. Dr. Oliver checked "yes" when asked whether rest beyond the normal rest breaks of 15 minutes in the morning and afternoon and 30 minutes for lunch would be "medically appropriate and/or necessary to the patient for the chronic back pain". When asked to describe the "principal clinical and laboratory findings, signs, and symptoms or allegations" from which the limitations were concluded, Dr. Oliver wrote, "chronic low back pain requiring chronic analgesic medications." Dr. Oliver was asked how often plaintiff would be expected to miss work due to her impairments or treatments, and

35

he checked "three times." Finally, Dr. Oliver was asked whether in his medical opinion, the non-exertional limitations were "medically founded in the principal clinical and laboratory findings, signs, and symptoms, and documented by objective findings" and he checked, "yes."

On August 2, 2007, plaintiff saw Dr. Oliver for a follow up on chronic pain and depression (Tr. at 597). "She has been out of medicines for a little while, mainly because she had not had an appointment for a while, so we made her come back. She has done better off the Effexor [antidepressant] as far as some side effects from it, but still needs something for her depression. She has never been on Celexa [antidepressant] though. The Norco [narcotic] seems to work well. She tries to avoid things that are too habit forming as she has a problem with addictions." Dr. Oliver performed an exam and found that plaintiff had tenderness in the lower thoracic lumbar region of her back. He assessed chronic low back pain with fibromyalgia and depression. He prescribed Norco (narcotic) and Celexa (antidepressant) and told her to follow up in about five months.

*C.* *SUMMARY OF TESTIMONY*

During the October 16, 2007, hearing, plaintiff testified; and Dr. Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

36

1. **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 41 and is currently 43 (Tr. at 648). Plaintiff testified that she lives with her husband and her six-year-old granddaughter (Tr. 648, 670). She is covered by Medicaid (Tr. at 648). She has a GED (Tr. at 648-649). Plaintiff worked as a certified nurse's assistant from 1997 through 2000 (Tr. at 649). She quit that job to go to college (Tr. at 649). She only attended college for a couple of months (Tr. at 649). Plaintiff then worked as a certified nurse's assistant from 2001 until 2004 (Tr. at 649). She left that job after she was injured on the job (Tr. at 649). Plaintiff had a worker's compensation claim which, at the time of the administrative hearing, was resolved with respect to the employer insured but was ongoing with respect to the second injury fund (Tr. at 672).

Plaintiff injured her tail bone and as a result cannot walk or drive for very long and she cannot bend over very often (Tr. at 650, 653). In an average week, plaintiff will drive about 30 miles to her granddaughter's bus stop, to Wal-Mart, to her children's houses, and to the grocery store (Tr. at 670). She cannot pick up her grandchildren (Tr. at 653). On a good day, plaintiff can walk a half a mile (Tr. at 653). On a bad day, she stays inside and just walks around the house (Tr. at 653). The

37

most she can walk on a bad day is about 500 feet, or one city block (Tr. at 654). In a typical week, plaintiff has about five bad days and two to three good days (Tr. at 654). Plaintiff can stand for a maximum of five minutes at a time (Tr. at 657). She thinks she could stand for an hour total in an eight-hour work day (Tr. at 657). When plaintiff tries to drive, it hurts to sit in one position and her hands and wrists hurt (Tr. at 654). She drove to the hearing, but she testified that her husband usually drives her around (Tr. at 654). Plaintiff can only sit for about 20 minutes before she is in pain (Tr. at 655). She later testified that she could sit for a total of ten to 20 minutes per eight-hour workday, was reminded that she had said she could sit for 20 minutes at a time, and then testified that she could sit for a total of three hours per day (Tr. at 657). She first testified she can lift from waist to shoulder height about ten pounds maximum (Tr. at 655). When asked how much she could lift from waist to shoulder height for 2 1/2 hours per workday, she said 20 to 25 pounds (Tr. at 655). She then changed her answer back to ten pounds (Tr. at 656). If she had to lift frequently, she could lift a maximum of five pounds (Tr. at 656).

Plaintiff also had surgery on both hands for carpal tunnel syndrome and had surgery on her right hand for de Quervain's disease (Tr. at 651). Plaintiff continues to experience

38

tingling, numbness, and swelling of her hands (Tr. at 651-652).

As a result, she has difficulty using her hands for vacuuming,

raking, and using a computer (Tr. at 652). The vibration from

the vacuum cleaner bothers plaintiff's hands, she can only rake

for a short time, and she can only type for five minutes (Tr. at

652). Plaintiff also has arthritis in her hands (Tr. at 666).

Plaintiff is supposed to wear a brace every day, but sometimes

she does not because it rubs her wrist (Tr. at 667). She will

likely need to have surgery to relieve the pain, but it will

result in less mobility (Tr. at 667). When plaintiff wears her

wrist brace, she has less mobility with her hand and fingers (Tr.

at 667).

During a typical day, plaintiff gets up at 6:30 to get her

granddaughter ready for school (Tr. at 658). When her husband

takes her granddaughter to the bus stop, plaintiff starts to

clean the house (Tr. at 658). She watches television and takes

the dogs outside to go to the bathroom (Tr. at 658). Plaintiff

cleans and dusts, then she rests for a while (Tr. at 658). She

starts her laundry and then goes outside to see if there is

something she can do outside (Tr. at 658). She only does laundry

once a week, whereas she used to do it every day (Tr. at 658).

Sometimes her husband or daughter will help her with the laundry

(Tr. at 658-659). Plaintiff will take her granddaughter to the

39

park and sometimes she tries to swing with her (Tr. at 671).
Plaintiff cooks five times a week in the evenings (Tr. at 671).
She makes things like chili dogs, and she fries foods twice a
week (Tr. at 672). She cooks simple things (Tr. at 673). She
washes dishes, brushes her teeth, fixes her own hair, rakes her
yard, mows, and reads (Tr. at 671-672). Plaintiff can read one
book in about two weeks (Tr. at 672). It takes her several hours
to wash the dishes because she will wash plates and bowls then
take a break; wash silverware and knives; take a break; then wash
glasses, pots, and pans (Tr. at 673).

Plaintiff and her husband do the grocery shopping together
(Tr. at 659). She pushes the cart and he picks up the groceries
(Tr. at 659). Plaintiff can get items off the shelf and put them
in the basket if she does not have to stoop or reach too high
(Tr. at 659). Sometimes plaintiff takes the grocery bags from
the car to the house, but other times her husband or her kids
will carry them (Tr. at 659).

Plaintiff was first treated for depression when she was 17
(Tr. at 659-660). At the time of the hearing, plaintiff was
taking Celexa, 20 mg daily (Tr. at 660). She was taking
prescription Ibuprofen and Hydrocodone (a narcotic) for her back
pain (Tr. at 661).

Plaintiff also suffers from migraines (Tr. at 661). She has a migraine three to four times per week (Tr. at 661). Her migraines last from one to three hours (Tr. at 662). Dr. Oliver told her the Ibuprofen should help with the headaches, and she was taking Flexeril (a muscle relaxer) and Requip[13] for her headaches as well (Tr. at 662). When plaintiff has a migraine, she lies down in the dark, and her doctor tells her to take Advil Migraine (Tr. at 663).

Finally, plaintiff suffers from hip pain which limits her standing (Tr. at 663).

Plaintiff suffers from pain every day (Tr. at 663). On a typical day even with her medication, plaintiff's pain is a seven on a scale of one to ten (Tr. at 664). Without her medication, her pain would be a "ten plus" (Tr. at 664). Plaintiff lies down two to three times per day from 20 minutes to an hour each time (Tr. at 665). She sometimes uses a muscle rub on her back (Tr. at 665-666).

**2.  Vocational expert testimony.**

Vocational expert Dr. Cathy Hodgson testified at the request of the Administrative Law Judge.

The first hypothetical included a person with all of the limitations described by plaintiff in her testimony (Tr. at 674).

---

[13]Requip is used to treat restless leg syndrome.

41

The vocational expert testified that such a person could not work (Tr. at 674).

The second hypothetical included a person with the limitations as described by Dr. Shane Bennoch in a medical source statement completed on February 8, 2007 (Tr. at 585-588) wherein the doctor found that plaintiff could lift 20 pounds occasionally and less than pounds frequently; stand or walk for six hours per day; must periodically alternate sitting and standing; could occasionally climb stairs, kneel, crouch, crawl, or stoop; could never climb ramps, poles, ladders, ropes, or scaffolds; could never balance on narrow, slippery, or moving surfaces; could reach in all directions including overhead; had no visual, communicative, or environment limitations; and could only occasionally handle, finger, or feel. The ALJ stated that because Dr. Bennoch did not provide a time limit for sitting, the vocational expert should assume the person could sit all day so long as there was an ability to stand from time to time (Tr. at 674-675). The vocational expert testified that such a person could work as a counter clerk, DOT 249.366-010 with 107,000 positions in the country and 2,500 in the region; or the person could be a school bus monitor, DOT 372.667-042 with 36,000 in the country and 700 in the region (Tr. at 675).

Case 3:08-cv-05044-REL   Document 23   Filed 09/20/09   Page 42 of 67

The next hypothetical involved a person with the limitations as set forth by Dr. Malcolm Oliver in a medical source statement completed on April 29, 2007 (Tr. at 590-594) wherein he found that plaintiff could lift ten pounds; stand or walk for five hours total and for 30 minutes at a time; sit for six hours total and for 60 minutes at a time; could occasionally climb, balance, kneel, or crawl; could never stoop or crouch; had unlimited ability to reach, handle, finger, feel, see, hear, or speak; had no environmental limitations; would need to rest beyond the normal breaks of 15 minutes each morning and afternoon and 30 minutes for lunch; and would miss three days of work per month. The vocational expert testified that such a person could not work because the person could only perform light work but could never stoop, and because the person would miss three days of work per month (Tr. at 675-676). Normally a person can miss only 1.75 days per month and maintain employment (Tr. at 676). In addition, rest periods beyond the ten to 15 minute morning and afternoon breaks and 30 minute lunch break are not tolerated (Tr. at 676).

The fourth hypothetical included all of the limitations listed by Dr. Bennoch with the additional limitation that the person could lift a maximum of ten pounds (Tr. at 677). The vocational expert testified that such a person could not work (Tr. at 677).

43

## V.   FINDINGS OF THE ALJ

Administrative Law Judge David Fromme entered his opinion on November 30, 2007 (Tr. at 16-25).

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 18).

Step two.  The ALJ found that plaintiff suffers from lumbar spine degenerative disc disease with complaints of back pain but no neurological compromise, and tendonitis/arthritis of the wrists with history of carpal tunnel syndrome, all severe impairments (Tr. at 18).  He found that plaintiff's bronchitis and depression are not severe impairments (Tr. at 18-19).  He found that plaintiff's mental impairment results in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (Tr. at 19).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 19).

Step four.  Plaintiff retains the residual functional capacity to lift and carry 20 pounds occasionally and less than ten pounds frequently; sit, stand, and walk for six hours per day but must alternate sitting and standing/walking from time to

44

time; may occasionally kneel, crouch, crawl, stoop, and climb stairs; cannot climb ladders, ropes, scaffolds, poles, or ramps; cannot balance on narrow, slippery, or moving surfaces; is limited to occasional handling, fingering, and feeling; has an unlimited ability to reach; and has no visual, communicative, or environmental limitations (Tr. at 19). With this residual functional capacity, plaintiff cannot return to her past relevant work (Tr. at 23).

Step five. Plaintiff can perform other jobs that exist in significant numbers in the economy, such as counter clerk and school bus monitor (Tr. at 23-24).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set

45

forth the inconsistencies which led to his or her conclusions.
Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v.
Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ
explicitly discredits testimony and gives legally sufficient
reasons for doing so, the court will defer to the ALJ's judgment
unless it is not supported by substantial evidence on the record
as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit
plaintiff's subjective complaints is supported by substantial
evidence. Subjective complaints may not be evaluated solely on
the basis of objective medical evidence or personal observations
by the ALJ. In determining credibility, consideration must be
given to all relevant factors, including plaintiff's prior work
record and observations by third parties and treating and
examining physicians relating to such matters as plaintiff's
daily activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,
effectiveness, and side effects of medication; and functional
restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.
1984). Social Security Ruling 96-7p encompasses the same factors
as those enumerated in the Polaski opinion, and additionally
states that the following factors should be considered:
Treatment, other than medication, the individual receives or has

received for relief of pain or other symptoms; and any measures
other than treatment the individual uses or has used to relieve
pain or other symptoms (e.g., lying flat on his or her back,
standing for 15 to 20 minutes every hour, or sleeping on a
board).

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> [T]he claimant testified that she stopped working due to a
> lower back injury and bilateral carpal tunnel syndrome. She
> stated that she continues to have tingling and swelling of
> the hands and fingers and numbness of the hands and wrists.
> She added that she has arthritis of the hands and that she
> uses a hand brace, but has not seen the doctor who treats
> her hands in 1 year. She stated that she has difficulty
> with activities such as vacuuming, raking and using a
> computer due to her hand disorders. She stated that she is
> limited to typing for 5 minutes at a time. The claimant
> testified that, due to back pain, she is unable to bend and
> is limited to lifting 5 pounds frequently and 20-25 pounds
> occasionally, walking 1/2 mile, sitting for 20 minutes at a
> time and standing for 5 minutes at a time. She added that
> she believes she is able to stand for 1 hour total during an
> 8-hour work day and sit for 3 hours total during an 8-hour
> work day. The claimant additionally stated that she takes
> medication for depression, that she has migraine headaches
> 3-4 times a week and that her back pain radiates to the
> hips. She rated her back/hip pain as a "7" on a 1-to-10
> scale (with medication) and stated that she takes medication
> regularly for pain relief and also lies down 2 times a day
> for 20-60 minutes at a time to relieve pain. However, the
> claimant testified that she is able to do household chores,
> including cooking, washing dishes and getting her grandchild
> (who lives with her) ready for school. She added that her
> husband and children help her with chores. She stated that
> she also takes care of all her own personal needs and
> grooming, drives 30 miles per week, takes her grandchild to
> a park, reads books and sometimes mows and rakes her yard.

47

The medical evidence shows that the claimant has a history
of complaints of back pain.  X-rays of the lumbar spine she
underwent in August 2001 were negative. . . .  In June 2004,
the claimant was referred by Thomas Corsolini, M.D., for a
course of physical therapy.  The physical therapist stated
in a discharge summary that the claimant had made some
progress, but continued to be hypersensitive with her
treatments.  However, the claimant told the therapist that
she "[kept] busy all the time because she [hated] to sit
around." . . .  Dr. Corsolini stated on May 9, 2005, that
the claimant had sustained a mid and lower back strain, but
had reached maximum medical improvement by August 1, 2004,
required no further medical treatment and could return to
work with no restrictions.  He cited an MRI study of the
claimant's lumbar spine done on August 25, 2004, and read by
James Sauer, M.D., which showed no significant abnormality
except mild degenerative changes of the lumbar facet joints
at the L4-5 level. . . .  Dr. Corsolini had stated on June
23, 2004, that the claimant was complaining of pain, but had
full lumbar and thoracic range of motion.  He opined that
her pain was "not a significantly impairing type of
discomfort" and recommended Biofreeze analgesic gel, over-
the-counter pain medication and a regimen of stretching
exercises.  The doctor had additionally noted, on May 4,
2005, that the claimant's examination did not seem to be
consistent with the degree of discomfort and functional
impairment she reported.

On May 18, 2005, the claimant began seeing Benjamin Lampert,
M.D., a specialist in pain management.  She told him that
her back pain was so severe that her husband had to assist
her in getting out of bed in the morning. She added that she
was taking hydrocodone, Flexeril and non-steroidal anti-
inflammatory medications.  Dr. Lampert found no abnormality
on examination other than complaints of pain, some "pain
behaviors" and some positive Waddell's signs. He noted that
the claimant's lumbar MRI indicated that all of the discs
were "pristine," with only some mild spondylosis at L4-5
bilaterally and no signs of neural impingement. . . .

. . .  Dr. Bennoch further noted that Dr. Lampert's records
revealed that a nurse practitioner in his office had noted
"overreaction of facial expressions," together with symptom
amplification and positive axial loading and rotation,
during an examination of the claimant. . . .  He added that
he believed the claimant was using hydrocodone too

48

frequently and recommended treatment with anti-inflammatory
medication and muscle relaxants, with on-going pain
management care to monitor these medications. . . .

In completing a Social Security Administration questionnaire
as part of the application for benefits, the claimant stated
that she was able to clean her house, care for and play with
her 4 year old grandchild, cook complete meals on a daily
basis, watch television, care for her dog, do laundry, drive
a car, go shopping for groceries and personal items, manage
her finances, follow written instructions well and pay
attention "for a long time" if the task was "interesting."
These statements, together with her hearing testimony and
her statement to the physical therap[ist] that she kept
herself constantly busy, show that she engages in a fairly
normal range of daily activities and are inconsistent with
her allegation that she is disabled.

The medical records, moreover, do not support the claimant's
allegation of disability. . . . [T]he evidence further
shows that she has a tendency to magnify her symptoms,
possibly with a view toward secondary (or primary) gain.
Dr. Corsolini released her to return to work with no
restrictions, and no physician who examined or treated her
opined that she is totally unable to work.

(Tr. at 20-22).

## 1.  *PRIOR WORK RECORD*

Plaintiff's work record shows that she had only six years

during which she earned more than $10,000.  For five years out of

the 16 years with earnings, she earned significantly less than

$1,000 each year.  Plaintiff's earnings record supports the ALJ's

credibility determination.

## 2.  *DAILY ACTIVITIES*

Plaintiff reported in her Functional Report on September 17,

2005, that she took care of her granddaughter (to the extent of

49

doing everything for her), cleaned the house, and cooked meals daily.  She was able to clean for three hours per day, do laundry and shop.  In June 2004, plaintiff told her physical therapist that she keeps busy all the time because she hates to sit around. In May 2005, she reported on an occupational medicine patient intake questionnaire that she had been exercising regularly.  In May 2005, she told Dr. Lampert that she had to manage a three-year-old granddaughter whom she was raising.  Plaintiff testified that she took her granddaughter to the park, cooked five times a week, washed dishes, raked her yard, mowed, and took care of all of her own personal needs.

These daily activities are inconsistent with disability. This factor supports the ALJ's credibility determination.

**3.    *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

Dr. Corsolini noted in June 2004 that plaintiff's back pain was "not a significantly impairing type of discomfort."  In August 2007, Dr. Oliver noted that plaintiff had not been to see him in a year and had run out of her medicines as a result.

Two months passed after plaintiff's alleged onset date before she sought any type of medical treatment.  Plaintiff waited five months from December 15, 2004, until May 4, 2005, to seek any medical treatment for her impairments.  She waited four months between June 2006 and October 2006 before seeking

50

treatment for her impairments, with the exception of seeking treatment for a suspicious mole on August 16, 2006. There are no treatment records from October 12, 2006, through August 2, 2007. During that ten months, plaintiff saw Dr. Bennoch for an evaluation of her worker's compensation claim, and Dr. Oliver completed the Medical Source Statement. However, there is no evidence that plaintiff received treatment from any medical professional during that time.

Plaintiff's sporadic medical treatment, to the extent of running out of her medications, suggests that her symptoms were not as bad as she alleges. This factor supports the ALJ's credibility determination.

**4.    *PRECIPITATING AND AGGRAVATING FACTORS***

There is little evidence in the record of precipitating or aggravating factors. In November 2004, plaintiff told Dr. Oliver that her back pain was aggravated by lying down, which is inconsistent with his finding in the Medical Source Statement discussed below that she needed to lie down for relief of her pain. In May 2006, she reported that her back pain was worse from coughing. Plaintiff continued to smoke, however.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

On June 1, 2004, after plaintiff first injured her back, Dr. Corsolini prescribed physical therapy which resulted in

plaintiff's pain level decreasing from a 9-10 out of 10 to a 5 out of 10. Later that month, Dr. Corsolini recommended Biofreeze analgesic gel (over the counter) and stretches. In August 2004, Dr. Oliver recommended Motrin and stretching exercises. In December 2004, Dr. Oliver recommended Motrin, Tylenol for headaches, and stretching exercises. In May 2005, Dr. Lampert recommended depression management and antidepressants for plaintiff's back pain. He found that she should not be using narcotics. In July 2005, a nurse recommended an anti-inflammatory, an antidepressant, and the performance of exercises twice a day. In January 2007, Dr. Bennoch recommended anti-inflammatories and muscle relaxers and said plaintiff should not be using narcotics. Plaintiff testified that her doctor told her to use Advil Migraine for her headaches.

The clear recommendation from all of these doctors is that plaintiff use over-the-counter medications, exercises, anti-inflammatories, and muscle relaxers. Plaintiff's symptoms have been treated conservatively. It appears that Dr. Oliver is the only doctor who prescribed narcotics, that the other doctors who saw plaintiff believed she should not be taking narcotics, and that Dr. Oliver prescribed narcotics despite noting that plaintiff had trouble with addictions.

This factor supports the ALJ's credibility determination.

52

## 6.    FUNCTIONAL RESTRICTIONS

In June 2004, plaintiff told her physical therapist that she experienced pain after driving for an hour or more.  By the end of June, she was returned to work without any restrictions.  She was able to demonstrate normal lumbar and thoracic range of motion, full forward bending, and full back bending.

Dr. Oliver limited plaintiff's lifting to no more than ten pounds; however, that was done on a prescription pad and does not appear in any of the medical records.  This also accompanied a phone message from plaintiff requesting that particular restriction.  In May 2005, plaintiff told Dr. Corsolini that walking and sitting were not particularly painful, just uncomfortable.  In May 2005, Dr. Lampert recommended that plaintiff either get through her worker's compensation lawsuit or drop it, and concentrate on functioning.  Dr. Bennoch found that plaintiff could lift 20 pounds, stand or walk for six hours per day, and sit without limitation.  Dr. Oliver's findings are discussed at length in the next section.  Suffice it to say, Dr. Oliver did not recommend any functional restrictions in any of his medical records.

Dr. Oliver recommended that plaintiff do exercises, Nurse Bolser-DeClue recommended plaintiff exercise twice a day.  No doctor or other medical professional has ever recommended that

53

plaintiff limit her physical activities in any way. This factor supports the ALJ's credibility determination.

***B. CREDIBILITY CONCLUSION***

In addition to the above Polaski factors, I note the following: When plaintiff began physical therapy, she stated, "No one is touching me today." In the middle of physical therapy, she reported a 50% improvement; however, by the end of physical therapy when Dr. Corsolini said he would return her to work without restrictions, she stated that she really had made no improvement.

Plaintiff told Dr. Corsolini that she had no radiation of pain to her legs. She told Dr. Lampert that 50% of the time her pain radiated into her upper thighs. She told Nurse Bolser-DeClue that her pain radiated down her left leg. She told Dr. Bennoch her pain radiated into her hips.

On July 28, 2005, straight leg raising was negative. On August 23, 2005, straight leg raising was negative on the left, positive on the right. On January 31, 2007, straight leg raising was positive on both legs while lying and negative while sitting. Straight leg raising is positive only upon a complaint of pain during the exam.

On July 28, 2005, plaintiff had no tenderness on the sacroiliac joints, but one month later, on August 29, 2005, she

was tender on the sacroiliac joints bilaterally.  Tenderness is determined by the complaint of the person being examined.

Plaintiff told Dr. Corsolini that her pain was so bad her husband had to lift her out of bed, yet she continued to drive a car, do housework, and raise her toddler grandchild.  She told Dr. Bennoch that she had been on medication for depression since she was a teenager and on medication for migraines since she was 22.  However, the record reflects she was sporadically prescribed antidepressants, and she was told to take over-the-counter medicine when she complained of headaches or migraines.  Plaintiff testified that she was prescribed Requip for her headaches; however, the medical records reflect that Dr. Oliver prescribed Requip for restless leg syndrome after plaintiff complained of difficulty sleeping.

Dr. Corsolini found that his examination did not seem to be consistent with the degree of discomfort and functional impairment reported by plaintiff.  Dr. Lampert found that plaintiff had some psychological overlay related to secondary gain with her husband and possible primary gain with her worker's compensation lawsuit.  Nurse Bolser-DeClue noted that with any test she did, plaintiff's face expressed pain before the actual test was done.  She found symptom amplification with positive axial loading (a Waddell's sign for possible malingering) and

55

overreaction of facial expressions.  Dr. Bennoch noted positive
Waddell's signs and symptom magnification.

Plaintiff testified that she could only sit for 20 minutes
before she is in pain.  She later testified that she could sit
for a total for ten to 20 minutes in an eight-hour workday.  When
confronted with her previous testimony, she changed her testimony
again, saying she could sit for 20 minutes at a time and for a
total of three hours per day.

Plaintiff testified that she could lift about ten pounds
maximum.  She later said she could lift 20 to 25 pounds for two
and a half hours per day.  She later changed her answer back to
ten pounds.

Based on all of the above, I find that the substantial
evidence in the record as a whole supports the ALJ's finding that
plaintiff's subjective complaints of disabling pain are not
entirely credible.

## VII. CREDIBILITY OF THIRD PARTIES

Plaintiff argues that the ALJ erred in failing to address
the testimony of her son and daughter.

Plaintiff's son completed a "statement of claimant or other
person" on June 11, 2007 (Tr. at 121-122).  That statement reads
as follows:

> I have to come up to mow my mother's (Kimberly McMurray)
> yard when I get the chance.  I drive her to the store

56

because she has severe pains when driving too long.  I help as much as I can just so my mother doesn't have to be in pain, and most of the time she just physically can't do the work that I do for her.

Plaintiff's daughter did not date her statement of claimant or other person (Tr. at 123-124).  Her statement reads as follows:

I reside in the residence with my mother.  I live here to help her by cleaning and helping with my niece who resides in the residence.  I help put groceries away as well as carry them in.  I do laundry, move furniture when needed. As well as carry anything that requires lifting.  She is unable to mow the yard.  I have to do the dishes for her because she can not stand for long.  She is unable to carry anything as well as do anything that causes her to bend over or squat down for long.

The chores described by plaintiff's children are as follows: mowing, driving, cleaning, helping with plaintiff's grandchild, groceries, laundry, moving furniture, lifting, dishes, and carrying.

Plaintiff reported in her administrative paperwork that she mows the lawn.

Plaintiff reported that she drives about 30 miles a week, that she drove to the administrative hearing, and that her husband usually drives her around.  Plaintiff's own testimony contradicts that of her son with regard to driving.

Plaintiff reported that she was able to do housework for about three hours per day.  Her typical day included cleaning the house.

57

Plaintiff reported that she has to do "everything" for her grandchild, that she is raising the child.

Plaintiff reported that she sometimes drives to the grocery store, and sometimes she and her husband grocery shop together. She also testified that sometimes her children help her carry the groceries inside, which is consistent with her daughter's report.

Plaintiff testified that she does laundry twice a week, and that sometimes her husband or daughter helps her, which is consistent with what plaintiff's daughter reported.

It is unclear how often plaintiff needs to have furniture moved; however, I believe I can take judicial notice of the fact that many non-disabled people need help with moving furniture. Plaintiff's residual functional capacity as found by the ALJ does not appear to include the ability to move furniture in any event.

The residual functional capacity as determined by the ALJ includes a restriction on lifting and carrying.

Plaintiff testified that she does dishes in three parts, even describing what dishes she washes first, second, and last. She did not testify that she gets any help with dishes.

Even assuming that the statements by plaintiff's children which are not contradicted by plaintiff's testimony are completely true, it would not affect the outcome of this case. The residual functional capacity as found by the ALJ is

58

consistent with the limitations reported by plaintiff's children, again to the extent those limitations are not contradicted by plaintiff's own testimony.

Because even if the ALJ had explicitly acknowledged this evidence and credited it (to the extent not contradicted by plaintiff herself) the outcome would be the same, plaintiff's motion for judgment on this basis will be denied.

## VIII. OPINION OF TREATING PHYSICIAN DR. MALCOLM OLIVER

Plaintiff argues that the ALJ erred in discrediting the opinion of Dr. Oliver who found that plaintiff would need to take rest breaks beyond the normal 15-minute morning and afternoon breaks and a 30-minute lunch break; would need to miss three days of work per month for treatment and her impairment; and could only lift ten pounds maximum.

The ALJ had this to say about Dr. Oliver's opinion:

> Relatively little weight has been given to the opinion of Dr. Oliver because he is not a specialist in orthopaedics or occupational medicine and his conclusions are inconsistent with the other medical evidence of record, including his own office notes. His own explanation for his terse entries is "chronic low back pain requiring chronic analgesic medications." Uncritical reliance on claimant's subjective complaints is unsound in view of the evidence of symptom magnification noted by multiple sources.

(Tr. at 23).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial

59

evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

**1. Length of the treatment relationship.**

Plaintiff was treated by Dr. Oliver from 2004 through 2007.

**2. Frequency of examinations.**

Plaintiff saw Dr. Oliver four times in 2004 (subsequent to her alleged onset date), once in 2005, six times in 2006 (one of those times for a virus and another time for a suspicious mole), and one time in 2007. Plaintiff saw Dr. Oliver on June 1, 2006, complaining of trouble sleeping, and did not see Dr. Oliver again for anything relating to her impairments until August 2, 2007 -- a 14-month period. It was during that 14-month period that Dr.

60

Oliver wrote the opinion in question.  Therefore, because the frequency of exams around the time the opinion was rendered was very infrequent (i.e., less than annually), this factor supports the ALJ's decision to discredit the opinion of Dr. Oliver in the Medical Source Statement.

**3.  Nature and extent of the treatment relationship.**

Dr. Oliver saw plaintiff primarily for her disability-related impairments.

**4.  Supportability by medical signs and laboratory findings.**  As the ALJ noted in his opinion, Dr. Oliver's opinion is not supported by medical signs or laboratory findings.  During the first appointment on August 11, 2004, the physical exam section of Dr. Oliver's medical record is blank.  Dr. Oliver used forms which have pre-printed sections for ears, nose, throat, neck, respiratory, cardiovascular system, abdomen, rectal, back, skin, extremities, neuro/psych, office tests, labs and x-rays. He also noted on almost all of his records how long his visit lasted.  On this first visit, he spent 20 minutes with plaintiff, counseling her on the diagnosis, compliance with medications, and exercise.

The exam section of the September 15, 2004, form is blank. The appointment lasted 15 minutes.  The exam on November 15, 2004, included the finding of a muscle spasm and a notation of

61

decreased range of motion, although no range of motion numbers
were listed.  The appointment lasted 15 minutes.  On December 15,
2004, Dr. Oliver did perform an examination; however, the
appointment lasted only 15 minutes.  Most of the exam was
unrelated to her impairments; however she did have "slightly
decreased" range of motion along with vertebral tenderness in her
back.  For these symptoms, Dr. Oliver recommended stretching
exercises, Motrin, and Tylenol.

On September 20, 2005, no physical exam was performed.  Dr.
Oliver spent 15 minutes with plaintiff, and that time was
dominated by counseling.  On January 19, 2006, no physical exam
was performed, and the appointment lasted ten minutes.  On
February 28, 2006, no physical exam was performed, and the
appointment lasted ten minutes.  On March 30, 2006, no exam was
performed, and the appointment lasted 15 minutes.  On May 9,
2006, no exam was performed, and the appointment lasted ten
minutes.  On June 1, 2006, no physical exam was performed and the
appointment lasted 15 minutes.  On August 2, 2007, Dr. Oliver
performed an exam and found tenderness in the thoracic lumbar
region.  Although he noted that plaintiff had a problem with
addictions, he prescribed a narcotic for her pain.  This was
despite her having not been in his office for an exam related to

her impairments for 14 months, and she had not been in his office at all for the past year.

Dr. Oliver's own medical records make abundantly clear that he did not rely on any medical signs or laboratory findings. In addition, on the Medical Source Statement at issue, he was asked to describe the principal clinical and laboratory findings, signs, and symptoms "or allegation" from which the limitations were concluded; and he wrote, "chronic low back pain requiring chronic analgesic medications." Clearly Dr. Oliver relied only on "allegations" as he listed nothing other than plaintiff's own allegations in support of the limitations listed in the Medical Source Statement.

This factor supports the ALJ's decision to discredit the opinion of Dr. Oliver.

**5. Consistency of the opinion with the record as a whole.**
As the ALJ pointed out, no physician ever found that plaintiff was unable to work, that plaintiff needed to have an extraordinary number of rest breaks per day, or that plaintiff would need to miss three days of work per month. Doctors consistently found that plaintiff exaggerated her symptoms, a finding that is well substantiated as discussed above. Dr. Oliver's opinion with regard to the limitations on lifting are contradicted by plaintiff's own testimony, and his limitations on

63

her ability to work full time with respect to eight hours per day and without missing too many days per month is inconsistent with the record as a whole.

**Lifting.** Plaintiff testified that she could lift 20 to 25 pounds for up to two and a half hours per day. This is inconsistent with Dr. Oliver's finding that plaintiff could lift a maximum of ten pounds. I also note that there is a phone message in the record written on a message pad from Dr. Oliver's office stating that plaintiff wanted to have a ten-pound lifting restriction until she could get to the pain clinic, and someone wrote, "OK" by that request. It appears that the ten-pound lifting restriction was written, therefore, at plaintiff's request as opposed to being based on any medical need, as there is no mention of lifting restrictions in any of Dr. Oliver's treatment records.

**Rest periods.** There is absolutely no evidence that any doctor, including Dr. Oliver, advised plaintiff to rest throughout the day. Instead, there are various recommendations by doctors to exercise.

**Lying down.** The only reference in the record to lying down is plaintiff's own statement to Dr. Oliver on May 9, 2006, that she was coughing, and that her coughing was relieved by lying down. At the time, plaintiff continued to smoke, although

64

she acknowledged that her coughing aggravated her back pain. Dr. Oliver never recommended that plaintiff lie down, and neither did any other doctor who treated plaintiff.

**Missing work.** It is clear that plaintiff's appointments with Dr. Oliver would not account for her missing three days of work per month, as plaintiff rarely saw Dr. Oliver on an even monthly basis. Right after plaintiff's alleged onset of disability, Dr. Corsolini stated, "I do not think that any further medical treatment is indicated." In August 2004, Dr. Oliver told plaintiff to return "as needed." In November 2004, Dr. Oliver told plaintiff to return as needed. In December 2004, he told her to return as needed. In May 2006, he told her to return as needed. In January 2007, Dr. Bennoch stated that he did not recommend any further evaluation or treatment for plaintiff's carpal tunnel syndrome symptoms. In August 2007, Dr. Oliver noted, "She has been out of medicines for a little while, mainly because she had not had an appointment for a while, so we made her come back." At that time, it had been a year since plaintiff last saw Dr. Oliver. He told her to follow up in about five months.

Plaintiff's alleged onset date is June 25, 2004. She did not have any doctor appointments from that date until August 11, 2004. For the rest of that year, she saw a doctor once a month.

65

Plaintiff did not seek medical treatment in 2005 until May 4. From July 2005 through the end of the year, she saw a doctor about once a month. Plaintiff went to the doctor approximately eight times in 2006. In 2007, plaintiff saw Dr. Bennoch in connection with her worker's compensation claim, not for treatment. She did not seek medical treatment at all in 2007 until August 2 when Dr. Oliver made her come in for a visit because she had not been to see him for the past year and needed refills on her medications.

In addition to the infrequent medical visits, plaintiff's visits were primarily with Dr. Oliver and rarely lasted more than 15 minutes. Therefore, it is unclear how Dr. Oliver assumed that plaintiff would miss three days of work per month for treatment or due to her impairments.

This factor supports the ALJ's decision to discredit the opinion of Dr. Oliver in the Medical Source Statement.

**6. Specialization of the doctor.** Dr. Oliver is not a specialist, he is a general practitioner.

Based on all of the above, I find that the ALJ's decision to discredit the opinion of Dr. Oliver is supported by substantial evidence in the record as a whole.

Plaintiff also complains that the ALJ failed to consider or weigh the opinion of Kenneth Burstin, the psychiatric expert.

66

Dr. Burstin found that plaintiff's mental impairment is not severe. He found that her depression resulted in no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. As the ALJ at least afforded plaintiff "mild" mental limitations, I am unclear as to why plaintiff would argue that the ALJ should have given weight to Dr. Burstin who found no limitations at all.

## IX. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 20, 2009

67